UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AHMED ARFA, Individually And On Behalf of All Others Similarly Situated, | Civil Action No. 10-civ-9053 (RWS) |
| Plaintiff, | Judge:  Hon. Robert W. Sweet |
| v. | |
| MECOX LANE LIMITED, NEIL NANPENG SHEN, JOHN J. YING, PAUL BANG ZHANG, ALFRED BEICHUN GU, KELVIN KENLING YU, ANTHONY KAI YIU LO, DAVID JIAN SUN, UBS AG and CREDIT SUISSE SECURITIES (USA) LLC, | Oral Argument Requested |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

David M. Brodsky (david.brodsky@lw.com)
Robert J. Malionek (robert.malionek@lw.com)
Howard G. Baker (gregory.baker@lw.com)
John D. Castiglione (john.castiglione@lw.com)

LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY 10022
Telephone: (212) 906-1200

*Attorneys for Defendants Mecox Lane Limited, Neil Nanpeng Shen, John J. Ying, Paul Bang Zhang, Alfred Beichun Gu, Kelvin Kenling Yu, Anthony Kai Yiu Lo, and David Jian Sun*

<u>**TABLE OF CONTENTS**</u>

<u>**PAGE**</u>

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND ......................................................................................3

    **A.**    **IPO Disclosures** ...........................................................................4

    **B.**    **Post-IPO Releases** .......................................................................7

    **C.**    **The Instant Action** ......................................................................8

LEGAL STANDARD ..............................................................................................8

ARGUMENT ......................................................................................................10

**I.**    **THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 11 BECAUSE IT FAILS TO IDENTIFY ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS** ...................................................10

    A.    Plaintiff States No Viable Claim for Relief Regarding Alleged Misrepresentations of Mecox's Business Strategy ................................10

        1.    The Amended Complaint Fails to Identify Material Misrepresentations .....................................................10

        2.    Plaintiff Fails to Plead Fraud with Particularity Under Rule 9(b) .............17

        3.    The Claim is Barred by Negative Causation.............................19

    B.    The Amended Complaint Fails to Allege any Duty to Disclose or Material Misrepresentations Concerning Mecox's 3Q:10 and 4Q:10 Financial Data .........20

        1.    Mecox Had No Duty to Disclose 3Q:10 Financial Data, Which Nevertheless Were Consistent with Data Reported in the Prospectus .....20

        2.    Mecox Could Not Have Known or Disclosed 4Q:10 Financial Data........21

    C.    Plaintiff's Remaining Vague Allegations Fail to Establish Loss Causation or Any Material Misrepresentation........................................23

        1.    Claims Based on These Allegations are Barred by Negative Causation......................................................23

        2.    Plaintiff Fails to Provide any Specificity Demonstrating How These Allegations Demonstrate Material Misrepresentations .................23

**II.**    **THE COMPLAINT FAILS TO PLEAD CONTROL PERSON LIABILITY UNDER SECTION 15** ...............................................24

CONCLUSION .................................................................................25

## TABLE OF AUTHORITIES

**CASES**                                                                **PAGE(S)**

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ......................................................................................... 9

*Bell Atlantic v. Twombly,*
    550 U.S. 544 (2007) ......................................................................................... 8, 9

*In re Bristol-Myers Squibb Sec. Litig.,*
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) .............................................................. 23

*Campo v. Sears Holdings Corp.,*
    371 Fed. Appx. 212 (2d Cir. 2010) .................................................................. 15

*Chambers v. Time Warner, Inc.*
    282 F.3d 147 (2d Cir. 2002) ............................................................................... 4

*In re CIT Group, Inc.,*
    349 F. Supp. 2d 685 (S.D.N.Y. 2004) .............................................................. 25

*Coronel v. Quanta Cap. Holdings Ltd.,*
    No. 07-1405, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ............................... 22

*In re Duke Energy Corp. Sec. Litig.,*
    282 F. Supp. 2d 158 (S.D.N.Y. 2003) .............................................................. 24

*Dura Pharmaceuticals, Inc. v. Broudo,*
    544 U.S. 336 (2005) ......................................................................................... 19

*Halperin v. Ebanker Usa.com,*
    295 F.3d 352 (2d Cir. 2002) ............................................................................. 12

*Hayden v. County of Nassau,*
    180 F.3d 42 (2d Cir. 1999) ............................................................................... 25

*Higginbotham v. Baxter Int'l Inc.,*
    495 F.3d 753 (7th Cir. 2007) ............................................................................ 16

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,*
    936 F.2d 759 (2d Cir. 1991) ................................................................... 9, 11, 13

*In re IndyMac Mortgage-Backed Sec. Litig.,*
    718 F. Supp. 2d 495 (S.D.N.Y. 2010) .............................................................. 16

*Iowa Public Employees' Ret. System v. MF Global, Ltd.*,
    620 F.3d 137 (2d Cir. 2010) .......................................................................... 20, 23

*Jones v. N.Y. State Div. of Military & Naval Affairs*,
    166 F.3d 45 (2d Cir. 1999) .......................................................................... 25

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) ....................................................... 9, 18

*Ladmen Partners, Inc. v. Globastar, Inc.*,
    No. 07-0976, 2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008) .......................... 18

*In re Lehman Bros. Sec. and ERISA Litig.*,
    683 F. Supp. 2d 294 (S.D.N.Y. 2010) ............................................................ 9

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ......................................................................... 19

*Lowinger v. Pzena Inv. Mgt., Inc.*,
    341 Fed. Appx. 717 (2d Cir. 2009) ............................................................... 12

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    273 F. Supp. 2d 351 (S.D.N.Y. 2003) ........................................................... 15

*In re Morgan Stanley Information Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010) ...................................................................... 9, 25

*Odyssey Re (London) Ltd. v. Stirling Cooke Brown Hldgs Ltd.*,
    85 F. Supp. 2d 282 (S.D.N.Y. 2000) ............................................................. 18

*Olkey v. Hyperion 1999 Term Trust, Inc.*
    98 F.3d 347 (2d Cir. 1996) .......................................................................... 11

*Pani v. Empire Blue Cross Blue Shield*,
    152 F.3d 67 (2d Cir. 1998) .......................................................................... 19

*Panther Partners, Inc. v. Ikanos Communs., Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008), *rev'd on other grounds,* 347 Fed. Appx. 671
    (2d Cir. 2009) ....................................................................................... 22, 24

*Puerto Ricans for Puerto Rico Party v. Dalmau*,
    544 F.3d 58 (1st Cir. 2008) .......................................................................... 24

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) .................................................................. 9, 17, 18

*Rusyniak v. Gensini*,
   629 F. Supp. 2d 203 (N.D.N.Y. 2009) ................................................................. 24

*Schoenhaut v. Am. Sensors, Inc.*,
   986 F. Supp. 785 (S.D.N.Y. 1997) ...................................................................... 22

*Segatt v. GSI Holding Corp.*,
   No. 07-11413, 2008 WL 4865033 (S.D.N.Y. Nov. 3, 3008) ............................... 25

*In re Shoretel Inc.*,
   No. 08-00271, 2009 WL 248326 (N.D. Cal. Feb. 2, 2009) ................................. 20

*Sira v. Morton*, 380 F.3d 57 (2d Cir. 2004) ................................................................. 4

*In re State Street Bank and Trust Co. Fixed Income Funds Inv. Litig.*,
   No. 08-8235, 2011 WL 1206070 (S.D.N.Y. Mar. 31, 2011) ............................... 19

*Steinberg v. PRT Group, Inc.*,
   88 F. Supp. 2d 294 (S.D.N.Y. 2000) ................................................................... 11

*Stern v. Leucadia Nat'l Corp.*,
   844 F.2d 997 (2d Cir. 1988) ................................................................................ 15

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
   202 F. Supp. 2d 8 (S.D.N.Y. 2001) ..................................................................... 21

*Zucker v. Quasha*,
   891 F. Supp. 1010 (D.N.J. 1995) ........................................................................ 22


**STATUTES**

15 U.S.C. § 77k(a) ......................................................................................................... 9

15 U.S.C. § 77k(e) ............................................................................................... 19, 20

**RULES**

Fed. R. Civ. P. 9(b) .................................................................................................. 9, 24

**REGULATIONS**

17 C.F.R. § 210.3-12 .............................................................................................. 20, 21

17 C.F.R. § 229.303 ..................................................................................................... 20

17 C.F.R. § 229.303(a)(3)(ii) ....................................................................................... 21

Defendants Mecox Lane Limited ("Mecox" or the "Company"), Neil Nanpeng Shen, John J. Ying, Paul Bang Zhang, Alfred Beichun Gu, Kelvin Kenling Yu, Anthony Kai Yiu Lo, and David Jian Sun (the "Individual Defendants") (collectively, the "Defendants") respectfully submit this Memorandum of Law in support of their Motion to Dismiss with prejudice Lead Plaintiff Westend Group's ("Plaintiff") Consolidated Amended Class Action Complaint (the "Amended Complaint") under Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

On October 6, 2010, Mecox, the operator of one of China's leading online platforms for apparel and accessories, filed a registration statement to conduct an initial public offering ("IPO") of its American Depositary Shares ("ADSs"), which was declared effective twenty days later.  On November 29, 2010, Mecox issued a press release announcing results from the third quarter of 2010 ("3Q:10"), and issuing guidance for the fourth quarter of 2010 ("4Q:10").  The results for 3Q:10 were consistent with data reported in the Prospectus, but, following the 4Q:10 revenue forecast contained in the press release, the value of Mecox's ADSs declined.  Now Plaintiff, an investor in Mecox ADSs, asserts a series of vague, scattershot theories in an effort to show that Defendants made material misrepresentations in the Prospectus—theories that represent a wholesale departure from those advanced in the initial complaints filed in this action.  Not one, however, constitutes a claim under Sections 11 or 15 of the Securities Act of 1933.

Plaintiff fails to present sufficient allegations that the Prospectus contained any material misstatement or omission.  The Amended Complaint—which is primarily based on irrelevant opinions expressed in periodicals, a business school case-study, statements by a confidential witness with no knowledge of Mecox's internal operations, and various mischaracterizations of

1

the Prospectus itself[1]—alleges that the Prospectus contained five categories of material misstatements and omissions:

*First*, Plaintiff claims the Prospectus *implied* that Mecox's business was not focused on online sales, but instead was focused on the growth of its physical brick-and-mortar stores. Plaintiff proposes this inference based on two unrelated statements in the Prospectus: (1) that Mecox planned to open 25 additional stores in the second half of 2010 and (2) that Mecox planned to "promote higher margin sales" (which Plaintiff equates with sales from directly operated stores). But the Prospectus fully disclosed that Mecox is an online-focused business that was placing an even greater emphasis on sales from its online platform rather than from physical stores. And the "higher margin" statement plainly applied only to the type of products Mecox planned to sell, not to the segment through which those products would be sold. Moreover, the November 29, 2010 press release—the purported corrective disclosure—revealed no previously hidden "truth" about Mecox's online focus, meaning that as a matter of law this supposed false implication (which in any event is unfounded) did not cause Plaintiff's alleged losses.

*Second*, Plaintiff claims that Defendants hid Mecox's 3Q:10 and 4Q:10 financial data from investors. But Defendants had no duty to disclose Mecox's 3Q:10 results as they were consistent with properly reported financial data from the preceding quarters. With respect to the 4Q:10 online revenues, Defendants could not know, and had no duty under the federal securities laws to predict (much less disclose) 4Q:10 results a mere three weeks into that quarter.

The remaining categories of alleged misstatements and omissions are of no moment, as they lack both detail and factual support. Plaintiff claims that Defendants:

---

[1]    The Amended Complaint refers to the Registration Statement and Prospectus collectively as the "Prospectus," and Defendants will do the same. The Prospectus is incorporated into the Registration Statement.

2

- Failed to disclose the departure of a purportedly key executive prior to the IPO;
- Represented that Mecox had a marketing plan when it purportedly did not; and
- Represented that Mecox possessed an adequate internal control system for monitoring itself, when it purportedly did not.

These allegations are so conclusory that they do not satisfy Rule 8, let alone Rule 9(b)'s heightened pleading standard.[2]  Moreover, these matters fail to state a claim on causation grounds because, once again, the November 29, 2010 press release did not disclose a single word concerning executive departures, marketing plans, or internal controls.[3]

For the reasons set forth below, Plaintiff's attempt to craft a Securities Act claim where there is none should be dismissed in its entirety.

## FACTUAL BACKGROUND

Mecox is a Chinese company that operates one of China's leading online platforms for apparel and accessories.  (Am. Compl. ¶ 13.)  Mecox's product offerings include clothing, accessories, home products and beauty and healthcare products under Mecox's own proprietary brands and select third-party brands.  (*Id.*)  As described in the Prospectus, Mecox's revenues are derived primarily from sales of products through its online platform, while its network of physical stores—comprised of both directly operated stores and franchised stores—generates less than one quarter of its revenues.  (Prospectus at 13; *see also* Table 1, *infra*.)[4]

---

[2]     As discussed below, the Amended Complaint must be dismissed because it fails to meet even the most basic pleading standards.  As Defendants point out below, however, to the extent Plaintiff's allegations sound in fraud—as many do—the Amended Complaint comes nowhere close to satisfying the heightened pleading standards of Rule 9(b).

[3]     That Plaintiff is on a fishing expedition for passable claims is evidenced by the Amended Complaint's wholesale departure from the only theory advanced in the original complaints, *i.e.*, that Mecox failed to disclose its disappointing 3Q:10 results, which allegedly revealed it was not performing in line with historical trends (particularly with respect to Selling, General and Administrative expenses).  The original complaints contained no allegations about Mecox's promotion of its online sales platform, departures of executives, or marketing, and did not suggest that 4Q:10 data should have been divined before the quarter's end.

[4]     On a motion to dismiss, a court may consider "any written instrument attached to [the complaint] as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are

Mecox conducted an IPO at the outset of the 4Q:10.  On October 6, 2010, the Company filed a Form F-1 Registration Statement with the SEC for an IPO as a foreign issuer of 11,742,857 ADSs, which was declared effective along with a final prospectus on October 26, 2010.  (*See* Registration Statement; Prospectus.)[5]  Each ADS represented seven ordinary shares of Mecox stock at $11.00 per ADS, with a total price to the public of $129,171,427.00.  (Prospectus Title Page.)  Mecox's ADSs are listed on the Nasdaq Global Market under the symbol "MCOX."  (Prospectus at 10.)  UBS AG and Credit Suisse Securities (USA) LLC (the "Underwriter Defendants"), acted as lead underwriters for the IPO.  (Am. Compl. ¶ 23.)

### A.    IPO Disclosures

Mecox repeatedly disclosed as part of its IPO that the core of its business was its online platform.  Starting on its very first page, the Prospectus characterized Mecox as "China's leading *online platform* for apparel and accessories as measured by revenues in 2009," and stated that its "vision is to operate a leading *online platform* of fashion products in China."  (Prospectus at 1, 3 (emphasis added).)  Mecox met with potential and current investors in the preparation for the IPO ("Road Show"), where it made clear its focus was on online sales ("[w]eb will be the primary sales growth driver"), not its retail business ("[r]etail business is the weakest link").[6] (Road Show at 3-10, 29-32, 36-37.)

---

'integral' to the complaint."  *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." (internal citation omitted)).  Thus, the Court may consider the documents that are incorporated or integral to the Amended Complaint, attached as exhibits to the Baker and Shen Declarations.

[5]    True and correct copies of relevant excerpts of the Prospectus and the final amended Form F-1 Registration Statement, filed October 25, 2010, are attached to the Declaration of Howard G. Baker ("Baker Declaration") as Exhibits 1 and 2, respectively.

[6]    A true and correct copy of the Road Show presentation prepared by UBS is attached to the Baker Declaration as Exhibit 3.

Mecox's performance in the period leading up to the IPO, as disclosed in the Prospectus, underscored the Company's continuously increasing emphasis on its online platform. Table 1, *infra*, compiling data reported in the Prospectus, shows that from 2009 to the first half of 2010 (the period immediately preceding the IPO), the percentage of Mecox's total revenue generated by online sales increased from 72.8% to 78.5%, while the percentage of revenue from physical stores (directly operated and franchised) decreased by almost six percent:

| Table 1: Mecox Net Revenues[7] | | | | |
|---|---|---|---|---|
| | 2009 (in thousands of $) | 2009 (as percentage of total revenues) | Jan. 1, 2010 – June 30, 2010 (in thousands of $) | Jan. 1, 2010 – June 30, 2010 (as percentage of total revenues) |
| Online Platform | 129,362 | **72.8%** | 84,782 | **78.5%** |
| Directly Operated Stores | 37,388 | **21.0%** | 15,991 | **14.8%** |
| Franchised Stores | 10,939 | 6.2% | 7,261 | 6.7% |

The Prospectus disclosed the impact of Mecox expanding its business, with an increasing focus on its online platform and de-emphasis on its physical stores (particularly directly operated stores). *First*, this strategy would impact gross margins, as the Prospectus disclosed that gross margins for sales from directly operated stores are higher than those from the online segment (and from franchised stores):

| Table 2: Mecox Gross Margins By Business Segment[8] | | | | |
|---|---|---|---|---|
| | For Year Ending December 31, 2007 | For Year Ending December 31, 2008 | For Year Ending December 31, 2009 | For Six Months Ending June 30, 2010 |
| Directly operated stores | 58.1% | 55.6% | 57.1% | 55.2% |
| Franchised stores | 29.7% | 40.7% | 40.5% | 37.5% |
| Online Platform | 44.4% | 44.2% | 42.4% | 42.6% |

Indeed, the Prospectus made clear that Mecox's overall gross margins had declined in the two quarters prior to the IPO. (Prospectus at 73, 75.) The Prospectus also noted that "franchised

---

[7]     Table 1 is prepared from data reported on page 58 of the Prospectus.

[8]     Table 2 is prepared from data reported on pages 73, 75-76, 78 of the Prospectus.

stores' expansion at a faster pace compared to [the Company's] directly operated stores *may affect our gross margin*." (*See* Table 2, *supra*; Prospectus at 56, 59 (emphasis added).) Increased online sales and deemphasis on directly operated stores were not the only factors causing gross margins to decline. In the first six months of 2010, Mecox increased the number of "third-party branded products [it] offered through [its] online platform . . . the profit margin for which is lower than [Mecox's] own branded products." (Prospectus at 72.)

*Second*, the Prospectus explained that as the business expanded, and more personnel were added, operating expenses—particularly compensation and benefit expenses (which had been increasing significantly through 2010)—would continue to increase. (*Id.* at 57, 61-62.) Mecox predicted that the increase would continue "in the near term as [it] hire[s] additional personnel and incur[s] additional costs in connection with the expansion of [the] business and becoming a publicly traded company." (*Id.* at 62.)

*Third*, the Prospectus disclosed that to help control expansion-related costs, Mecox was shifting its physical store business model away from directly operated stores and towards franchised stores, which have lower operating costs. (*Id.* at 60, 110.) Mecox was operating nineteen fewer directly operated stores on June 30, 2010 than it was on December 31, 2009, and 95 more franchised stores on June 30, 2010 than it was on December 31, 2009. (*Id.* at 59.) This shift toward franchised stores provided Mecox with a quick and cost-effective way to expand into second- and third-tier cities, although it sacrificed the higher gross margins associated with directly operated stores. (*Id.* at 110; Table 2, *supra*.) Nowhere in the Prospectus did Mecox state that it was discontinuing its online strategy, or that it would focus more on directly operated stores (or physical stores more generally), or that it expected gross margins to rise.

### B.    Post-IPO Releases

The November 29, 2010 press release, which Plaintiff alleges revealed previously undisclosed truths about Mecox (Am. Compl. ¶¶ 78-79), actually disclosed accurate positive overall 3Q:10 results fully consistent with the disclosures in the Prospectus as outlined above—*i.e.*, it disclosed that Mecox's expansion strategy increased revenues for its online segment and for franchised stores, while decreasing revenue for directly operated stores; increased costs; and resulted in a slight decline in gross margins:

- "Total net revenues were $55.3 million in the third quarter of 2010, an increase of 36.0% from $40.7 million in the third quarter of 2009."

- "Net revenues from the online platform were $43.9 million in the third quarter of 2010, an increase of 53.1% from $28.7 million in the third quarter of 2009."

- "Net revenues from franchised stores were $4.9 million in the third quarter of 2010, an increase of 35.9% from $3.6 million in the third quarter of 2009."

- "Net revenues from directly operated stores were $6.5 million in the third quarter of 2010, a decrease of 22.3% from $8.4 million in the third quarter of 2009."

- "Selling, general and administrative expenses were $20.1 million in the third quarter of 2010, an increase of 20.4% from $16.7 million in the third quarter of 2009. The increase was primarily due to an 11.6% increase in marketing and advertising expenses, and a 40.2% increase in compensation and benefit expenses."

- Overall, "[g]ross margin was 39.7% in the third quarter of 2010, compared to 43.7% in the third quarter of 2009."

(November 29, 2010 Press Release at 5-6.)[9] The November 29, 2010 press release also included projections for 4Q:10 based on Mecox's assessment of events occurring after two months into the quarter. (*Id.* at 7.) While the earlier Road Show projected that full-year 2010 online revenues would be approximately $183 million, the November 29, 2010 press release included a revised revenue projection for the online segment of $172.4 million to $174.9 million.[10] (*See*

---

[9]     A true and correct copy of the Nov. 29, 2010 Press Release is attached to the Baker Declaration as Ex. 4.

[10]     Mecox revised its fourth quarter forecasts following increased competition and intensive marketing campaigns by Mecox's competitors. *See* Loretta Chao, *Alibaba Gives Taobao Mall Retail Site More Prominence*, WALL ST. J., Nov. 1, 2010 (noting that Taobao, a competitor of Mecox, would invest "about $30 million [] over the next three months in a marketing campaign," and that analysts expect business-to-consumer ("B2C") "competition

Road Show at 39; Prospectus at 58; November 29, 2010 Press Release at 5, 7.)  The price of Mecox's ADSs declined following the press release.

### C.   The Instant Action

On December 3, 2010, a putative class action complaint was filed in the Southern District of New York, alleging that the Prospectus failed to disclose Mecox's 3Q:10 financial data, which showed that Selling, General and Administrative expenses had increased, reversing a trend of falling expenses, and that gross margins had declined during the quarter, reversing a trend of improving margins.[11]  (*Arfa* Compl. ¶¶ 2, 20-26.)  A copycat complaint was filed on January 4, 2011.[12]  (*Brady* Compl. ¶¶ 3, 31.)  On April 1, 2011, the Court consolidated the cases and appointed the Westend Group as Lead Plaintiff.  Plaintiff filed the Amended Complaint on June 2, 2011, which revamped all theories with respect to the alleged claims and purports to be brought on behalf of all persons who purchased Mecox shares or traceable stock pursuant to the October 2010 Prospectus.  (Am. Compl. ¶ 104.)

### LEGAL STANDARD

The Amended Complaint fails to satisfy even the most basic pleading standards.  While the Court may assume the truth of well-pleaded allegations, and draw reasonable inferences in plaintiff's favor, a complaint must contain "allegations plausibly suggesting (not merely consistent with)" an "entitle[ment] to relief."  *Bell Atlantic v. Twombly*, 550 U.S. 544, 557 (2007); *In re Lehman Bros. Sec. and ERISA Litig.*, 683 F. Supp. 2d 294, 298 (S.D.N.Y. 2010).

---

will intensify") (Baker Decl. Ex. 5); Shen Jingting, *B2C website 360buy.com gets fund injection*, CHINA DAILY, Dec. 24, 2010 (noting that "[c]ompetition among major Chinese B2C companies has become increasingly fierce")  (Baker Decl. Ex. 6).  Although Mecox could not be expected to predict these market pressures, the Prospectus did caution investors about the risks:  "[M]any of our current or future competitors may have longer operating histories, better brand recognition, greater levels of customer trust, stronger platform management capabilities, better advertising and supplier relationships, a stronger sales force and/or greater financial, technical or marketing resources than [Mecox]."  (Prospectus at 120.)

[11]      *Arfa v. Mecox Lane Ltd., et al.*, Civil Action No. 10-cv-9053 (Docket No. 1.) ("*Arfa* Compl.")

[12]      *Brady v. Mecox Lane Ltd., et al.*, Civil Action No. 11-cv-0034 (Docket No. 1.) ("*Brady* Compl.")

Dismissal is appropriate where a plaintiff fails "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A pleading that offers 'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s] devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 555, 557).

Not only does the Amended Complaint fail to meet the requirements under *Twombly*, it comes nowhere close to satisfying the heightened pleading standard of Fed. R. Civ. P. 9(b) required because—as discussed below—the Amended Complaint sounds in fraud. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004); *see also In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) (if complaint sounds in fraud, "plaintiffs must comply with the pleading requirements of Fed. R. Civ. P. 9(b) when alleging violations of § 11 . . . even though the statutory provision only requires a mental state of negligence").

To adequately state a claim adequately under Section 11, Plaintiff must demonstrate that Mecox's offering documents "contained an untrue statement of a material fact, omitted to state a fact in contravention of an affirmative legal disclosure obligation, or omitted to state a material fact necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *see In re Morgan Stanley Information Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) ("[T]wo issues are central to claims under sections 11 and 12(a)(2): (1) the existence of either a misstatement or an unlawful omission; and (2) materiality."). The "central inquiry" is "whether defendants' representations, taken together and in context, would have [misled] a reasonable investor about the nature of the investment." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991).

**ARGUMENT**

I.    **THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 11 BECAUSE IT FAILS TO IDENTIFY ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS**

    **A.    Plaintiff States No Viable Claim for Relief Regarding Alleged Misrepresentations of Mecox's Business Strategy**

Plaintiff primarily complains that the Prospectus was materially false and misleading because it somehow *implied*—and thus purportedly misled investors into believing—that Mecox would increase its emphasis on generating revenue through physical stores, particularly directly operated stores.  (*E.g.*, Am. Compl. ¶¶ 2, 32 (the Prospectus "[c]laimed that Mecox intended to 'promote higher margin sales,' noting that its highest margin sales came from its directly operated stores, and its lowest margin sales came from the online segment").)  Plaintiff cobbles together this inference based on separate statements taken out of context from the Prospectus: *first*, that Mecox "had [as of June 30, 2010] 478 stores in 182 cities in China," and "plan[ned] to open an additional approximately 20 franchised stores and five directly operated stores in 2010," (Am. Compl. ¶ 32 (quoting page 17 of the Prospectus)); and *second*, that Mecox intended to "[p]romote higher margin sales." (Am. Compl. ¶ 43 (quoting page 105 of the Prospectus).)  The inference Plaintiff proposes, however, is flatly contradicted by disclosures in the Prospectus.

    1.    The Amended Complaint Fails to Identify Material Misrepresentations

        a.    *The Prospectus Disclosed that Mecox was Focused on its Online Platform*

The Prospectus states that Mecox is "China's leading *online platform* for apparel and accessories as measured by revenues in 2009," and that its "vision is to operate a leading *online platform* of fashion products in China."[13]  (Prospectus at 1, 3 (emphasis added).)  Similarly, as acknowledged in the Amended Complaint, Mecox predicted that it was "well-positioned to *increase online sales* to customers in second- and third-tier cities as they become more

---

[13]    Several paragraphs on page 1 of the Prospectus describe the Company's online platform.

accustomed to *online shopping*."  (*Id.* at 105 (emphasis added); Am. Compl. ¶ 33.)  The raw data presented in the Prospectus further confirmed that the core of Mecox's business was its growing online sales.  In the period immediately preceding the IPO (the end of 2009 to June 2010), the overall revenue generated from Mecox's online sales tripled the revenue generated from physical stores, and the gap was widening.  (*See* Table 1, *supra*.)  There was simply no ambiguity in the Prospectus that the core of Mecox's business was its online platform.[14]  *See I. Meyer Pincus*, 936 F.2d at 761 ("central inquiry" in determining whether a registration statement is materially misleading is "whether defendants' representations, taken together and in context, would have [misled] a reasonable investor about the nature of the investment"); *Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 5 (2d Cir. 1996) (offering documents "must be read as a whole" to determine whether they were false or misleading on their effective date).

Mecox also clearly disclosed that it was moving away from directly operated stores. While Plaintiff complains that Defendants failed to disclose prior to the IPO that nineteen fewer directly operated stores were being operated in 3Q:10 than in 2009 (Am. Compl. ¶ 37), the Prospectus *disclosed just that.*  (Prospectus at 59 (containing tables listing number of directly operated stores from 2007 to mid-2010).)  *See Steinberg v. PRT Group, Inc.* 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000) (dismissing complaint with prejudice; allegations that directly contradict the offering documents need not be accepted as true).

---

[14]     Plaintiff incorrectly alleges that the Prospectus "conditioned investors to believe that the Company . . . was operating in accordance with the guidance sponsored and/or endorsed by Defendants during its investor presentations and 'road show' presentations hosted at or before the time of the IPO."  (Am. Compl. ¶ 29.)  The Road Show presentation prepared by co-defendant UBS in fact informed investors that Mecox was focused on its online product, rather than physical (retail) stores.  (Road Show at 3-10, 29-32.)  It explained that for Mecox, the "[w]eb will be the primary sales growth driver" (*id.* at 30), and that Mecox's "[r]etail business is the weakest link" (*id.* at 36.)  It also predicted that retail stores would not contribute to Mecox's profit in 2010 and 2011, and even forecasted that for fiscal year 2010, revenues from directly operated stores would decline by 9%.  (*Id.* at 36-37.)

In any event, Mecox's statement in the Prospectus about potential new store openings is not actionable because it is a forward looking statement protected by the "bespeaks caution" doctrine.  The Prospectus specifically warned that Mecox may not be as successful as it hoped in opening new physical stores:

> As of June 30, 2010, we had 478 stores in 182 cities in China.  We plan to open an additional approximately 20 franchised stores and an additional approximately five directly operated stores in 2010.  *We may not be able to successfully and effectively manage the rapid growth of our physical store network. Therefore, there is no assurance that the intended growth of our store network can be achieved or will be profitable.*  If we do not successfully manage the expansion of our store network, our operating costs may increase and our sales and financial results may be adversely affected.
>
> ******
>
> We plan to continue to increase [franchising] arrangements over time as part of our efforts to expand into less developed markets in China. . . . *[T]hese franchisees may not be able to meet their projections regarding store openings, sales and other aspects of franchising arrangements.*

(Prospectus at 17-18 (emphasis added).)  Under the "bespeaks caution" doctrine, these warnings rendered purported misrepresentations concerning Mecox's store-opening prospects "immaterial as a matter of law" because reasonable investors could not "consider the [optimistic statements] important in light of adequate cautionary language set out in the same offering."  *Lowinger v. Pzena Inv. Mgt., Inc.*, 341 Fed. Appx. 717, 720 (2d Cir. 2009) (upholding dismissal of Section 11 claims) (quoting *Halperin v. Ebanker Usa.com*, 295 F.3d 352, 357 (2d Cir. 2002)).  Because Mecox "identif[ies] the allegedly undisclosed risk" in the Prospectus that Mecox may not be able to manage the expansion of its physical store network successfully, the alleged misstatements concerning that expansion are immaterial as a matter of law.  *Halperin,* 295 F.3d at 359.[15]

---

[15]   The number of stores that the Company expected to open was also immaterial in light of the total number of existing stores:  20 franchised stores out of 320 (as of June 30, 2010) and 5 directly operated stores out of 158 (as of June 30, 2010).  (Prospectus at 59.)

   b. *Mecox's 3Q:10 Gross Margins were Consistent with the Trends Disclosed in the Prospectus*

   Plaintiff alleges that the Prospectus's statement that Mecox intended to "[p]romote higher margin sales" misled investors into believing the Company would focus on directly operated stores, which operated at higher margins than its other business segments.  (Am. Compl. ¶¶ 3, 34, 41-44.)  That allegation is utterly disingenuous.  Mecox's reference to promoting higher margin sales concerned its efforts to "continue to identify and focus [] resources on *fashion product categories* that offer high margins and increase [] market share in such categories [] as branded apparel and accessories."  (Prospectus at 105-106 (emphasis added).)  The statement was not about a shift in strategy to focus on directly operated *stores*.  *See I. Meyer Pincus*, 936 F.2d at 761 (court must "view[] defendants' representations together and in context").

   Indeed, there was no basis for reasonable investors to believe that Mecox was focusing on higher-margin business segments, or that its overall gross margins were trending upward.  In this regard, the Prospectus made four key disclosures: (1) Mecox's overall gross margins had declined from 2009 to the first half of 2010 (Prospectus at 73, 75); (2) Mecox was trending away from higher margin directly operated stores and towards lower margin franchised stores, noting that "franchised stores' expansion at a faster pace compared to . . . directly operated stores *may affect our gross margin*" (*see* Prospectus at 56, 59 (emphasis added)); (3) during the first half of 2010, Mecox increased its percentage of revenues from online sales, which had lower gross margins than its directly operated stores (*see* Table 1, *supra*; Table 2, *supra*); and (4) there had been an "increase in third-party branded products [that Mecox] offered through [its] online

platform for the six months ended June 30,2010, the profit margin for which is lower than [its]

own branded products."[16] (Prospectus at 72.)

          c.    *The Miscellaneous Sources Cited in the Amended Complaint do not Support Plaintiff's Claim*

          (1)    Statements in Periodicals

Plaintiff cites three articles to support its claim that Defendants misrepresented Mecox's

alleged strategy of increasing emphasis on physical stores.[17]  Generally, the October 28, 2010

*Economic Herald* and July 29, 2010 *Beijing Business Today* articles explain that former Mecox

executive Wang Hongzheng, who had been involved in the development of Mecox's retail

stores, had left Mecox, and describe the challenges faced by all companies in managing online

platforms simultaneously with physical store platforms.  (Am. Compl. ¶¶ 45–54.)  The January

28, 2011 B-School Case Study presents a critique of Mecox's business strategy of operating not

just an online segment but also physical stores.  (*Id.* ¶ 95.)  Plaintiff claims that these articles

indicate that Mecox knew it would be a challenge to manage its online operations simultaneously

with its physical store operations.

None of these articles, however, is inconsistent with the Prospectus.  For example, the

*Beijing Business Today*'s statement that Mecox "will continue with the expansion of the online-

offline multi-channel model, and the direction of retail store expansion will also remain

unchanged," and the *Economic Herald*'s statement that Mecox's CEO still supports the concept

---

[16]     In fact, the Company's 4Q:10 results ended up entirely consistent with these disclosures.  In a March 1, 2011 press release, the Company explained the slight year-over-year decrease in gross margins from 4Q:09 as "primarily due to the combined effects of (i) the increase in weighting of Internet business in total net revenues, (ii) an increase in net revenues from third-party branded products, for which the profit margin is lower than for the Company's own branded products; and (iii) the increased number of franchised stores in operation, where the Company offered a higher average discount rate to its franchisees."  (March 1, 2011 Press Release at 2 (cited in Am. Compl. ¶ 96).)  A true and correct copy of the March 1, 2011 Press Release is attached to the Baker Declaration as Exhibit 7.

[17]     Certified translations of the *Economic Herald* article titled "Gu Beichun: Mecox Lane is Testing 'Offline Stores'"; the *Beijing Business Today* article titled "Head of Retail at Mecox Lane Departs: Multi-Channel Expansion Could be a Dead End"; and the B-School Case Study titled "Case study of B-School: Achilles heel of Mecoxlane's Three-Channel Strategy" are attached to the Baker Declaration as Exhibits 8, 9, and 10, respectively.

of "online + offline + catalog,"[18] merely underline that Mecox planned to continue promoting its

online business while still operating physical stores—a point made repeatedly in the Prospectus.

Moreover, these articles express the opinions of the respective authors,[19] none of whom is

alleged to have actual knowledge about Mecox's internal operations or business strategy.  As a

matter of law, press speculation does not support claims for violations of the securities laws.

*Campo v. Sears Holdings Corp.*, 371 Fed. Appx. 212, 215 (2d Cir. 2010) (press speculation,

without more, does not support an allegation of fraud); *In re Merrill Lynch & Co., Inc. Research

Reports Sec. Litig.*, 273 F. Supp. 2d 351, 374 (S.D.N.Y. 2003) (plaintiff cannot establish falsity

merely by quoting press speculation); *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1004 (2d Cir.

1988) ("It is not enough to quote press speculation about defendants' motives.  Such allegations

simply do not provide . . . specific, well-pleaded facts.") (quotation omitted).[20]

### (2)   Statements by Confidential Witness

To bolster its claim that Mecox did not support its physical stores, Plaintiff presents

allegations from "CW1," identified only as "a franchisee of Mecox physical stores."  (Am.

Compl. ¶¶ 56-59.)  CW1 complains that Mecox: allowed other franchisees to open stores in

his/her district; failed to send clothing of the quality CW1 expected (the "quality of the clothes

received in the stores is not as good as what the models wear during the order conference"); and

directed business to the Mecox website, which impacted CW1's business.  (*Id.*)  CW1's

---

[18]     The phrase "online+offline+catalog" refers to Mecox's online platform, catalog sales through its call center, and offline sales through its retail stores.  (*See* Prospectus at 7.)

[19]     *E.g.*, *Beijing Business Today* article: "pointed criticism indicates that walk-in retail stores are 'children' entrusted to online shopping, and that online shopping and retail stores contradict each other as if 'the left hand is fighting the right hand'"; *Economic Herald* article: "Doing retail both online and offline poses a significant challenge to any team.  This is not a question of the [business] model, but a question of whether it can be done."

[20]     In any event, Plaintiff's reliance upon these articles is fundamentally inconsistent with its theory that Mecox should have emphasized its physical store business rather than its online segment.  Indeed, these articles opine on the risks regarding a business strategy of advancing multiple business segments rather than just focusing on a single (online) platform.

allegations are nothing more than those of a disgruntled franchisee and say nothing about

Mecox's strategy with respect to franchised stores, let alone Mecox's purported sudden shift in

focus away from directly operated stores and *towards* other segments.  *See In re IndyMac*

*Mortgage-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 510 (S.D.N.Y. 2010) (CW allegation in

support of Section 11 claim that "appraisals were 'shoddy,' says nothing at all about whether the

appraisals were made in accordance with [professional standards]"); *see also Higginbotham v.*

*Baxter Int'l Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) (questioning reliance on confidential sources

who "have axes to grind").  Moreover, although Plaintiff suggests that this testimony indicates

Mecox abandoned its franchised stores after the IPO, the fact is that Mecox *increased* the

number of franchised stores in the second half of 2010, and net revenues from franchised stores

*increased* by 65% in 2010.  (20-F Statement at 4, 55; Prospectus at 59.)[21]

> d.    *The Prospectus Forecasted that Expenses Could Increase*

Plaintiff also vaguely alleges that Mecox failed to disclose the extent to which expenses

would increase as part of its business strategy:

> While the Company claimed that '[t]he expansion of our directly operated stores
> also increased our compensation and benefit expenses and rental expenses,' those
> expenses climbed dramatically in the third quarter of 2010, even as the Company
> completely halted the expansion of its directly-operated stores.  Undisclosed to
> investors, third quarter 2010 compensation and benefit expenses had increased
> 40.2% from the same quarter of the previous year.  (Am. Compl. ¶ 38.)

That is flatly wrong.  Mecox clearly explained in the Prospectus not only that expenses had

increased and were expected to continue to increase, but that these increases were caused by a

variety of factors relating to its various business segments (not just directly operated stores).  For

example, Mecox disclosed that "[w]ith the expansion of our business, we have experienced

increases in operating expenses, including compensation and benefit expenses for our retail and

---

[21]    A true and correct copy of excerpts of Mecox's Form 20-F Annual Report for the fiscal year ended
December 30, 2010 is attached hereto as Exhibit 11.

corporate office employees, . . . call centers, logistics center and corporate facilities, marketing and advertising expenses."[22]  (Prospectus at 57.)  Mecox also disclosed in the Prospectus that it expected that its "selling, general and administrative expenses," which consist of, among other things, "compensation and benefits for [] directly operated store *and corporate office employees*," "will increase in the near term as we hire additional personnel and incur additional costs *in connection with the expansion of our business*."  (Prospectus at 61-62 (emphasis added).)  As even the *Arfa* complaint admitted, the "Prospectus disclosed that [Mecox] expected expenses to increase in the near term as [it] expanded its operations," an admission that is conspicuously absent from the Amended Complaint.  (*Arfa* Compl. ¶ 25.)

2.     Plaintiff Fails to Plead Fraud with Particularity Under Rule 9(b)

To be clear, the Amended Complaint must be dismissed because it fails to satisfy even the most basic pleading standards under Rule 8.  But because the "wording and imputations of the complaint are classically associated with fraud," it also is subject to Rule 9(b)'s heightened pleading requirements.  *See Rombach*, 355 F.3d at 172 (allegations that "[r]egistration statement was 'inaccurate *and* misleading;' that it contained '*untrue* statements of material facts'; and that 'materially *false* and *misleading* written statements' were issued" all are "classically associated with fraud").  Plaintiff alleges not only that Defendants made "a number of *materially untrue and misleading statements and omissions*," (Am. Compl. ¶ 2), but also that Defendants knew—yet specifically withheld—various material facts from the Prospectus.  As Plaintiff alleges, for example, Defendants:

- represented that Mecox would focus on its physical stores when the Company already had determined—and therefore must have known—that it would not do so (*see* Am. Compl. ¶¶ 5, 32–37 (alleging Mecox made a "pre-IPO decision to abandon support

---

[22]     The Prospectus disclosed that compensation and benefit expenses had increased, year-over-year, from $10.6 million in the first six months of 2009, to $17.6 million in the first six months of 2010, a <u>66%</u> increase. (Prospectus at 61.)

for its physical stores," but misled investors into believing it was promoting physical store growth));

- must have known the allegedly negative 3Q:10 results in early October, but withheld those results (*see id.* ¶ 75 ("In truth . . . the Prospectus failed to include material information regarding Mecox's third quarter (completed prior to the IPO).")); and

- omitted "known uncertainties" about Mecox's business that the Company withheld until its November 29, 2010 press release (*See id.* ¶¶ 3, 74 (alleging Prospectus failed to disclose "known uncertainties" and "[i]t was only on November 29, 2010 . . . that Mecox began to reveal the previously-undisclosed truth about the company").)

Despite Plaintiff's attempt at artful pleading, those allegations sound in fraud.  *See, e.g.*, *Ladmen Partners, Inc. v. Globastar, Inc.*, No. 07-0976, 2008 WL 4449280, at *11 (S.D.N.Y. Sept. 30, 2008) (Section 11 claims sounded in fraud where plaintiff alleged that defendant withheld materially negative information prior to IPO).  It does not matter that Plaintiff has not used the term "fraud" in its pleadings.  *Rombach*, 355 F.3d at 171 ("Rule 9(b) applies to 'all averments of fraud' . . . and is not limited to allegations styled or denominated as fraud").  The Amended Complaint does not satisfy Rule 9(b) because it fails to include particularized factual allegations regarding the manner in which the purported misstatements and omissions were fraudulent—for example, who at Mecox knew that it supposedly intended to abandon its physical stores (an allegation that is untrue in any event); how such purported misrepresentations misled Plaintiff; or what each Defendant obtained by the fraud.  *In re JP Morgan Chase,* 363 F. Supp. 2d at 615 (Rule 9(b) requires complaint to identify false statements, who made them, when they were made, and why they are false) (quotation omitted); *cf. Odyssey Re (London) Ltd. v. Stirling Cooke Brown Hldgs Ltd.*, 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000) (complaint must specify "(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff; and (4) what defendant obtained through the fraud").  The Amended Complaint likewise fails to allege who knew at the time of the IPO that Mecox's 3Q:10 results would reveal purported trends about Mecox's margins, or

18

how that omission misled Plaintiff.  For these additional reasons, the Amended Complaint should be dismissed.

3.      <u>The Claim is Barred by Negative Causation</u>

Plaintiff's theory of loss causation is that the November 29, 2010 press release revealed to the public, for the first time, that Mecox intended to focus its business on its online platform. But because Mecox's online strategy was fully disclosed in the Prospectus, Plaintiff cannot demonstrate that any revelation in the Press Release caused its loss.

A complaint may be dismissed for lack of causation (or "negative causation") under 15 U.S.C. § 77k(e) "if a defendant can show that it is apparent on the face of the complaint that the alleged loss is not causally connected to the misrepresentation at issue."  *In re State Street Bank and Trust Co. Fixed Income Funds Inv. Litig.*, No. 08-8235, 2011 WL 1206070, at *3 (S.D.N.Y. Mar. 31, 2011) (citing *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) (an "affirmative defense may be raised by a [motion to dismiss] without resort to summary judgment procedure, if the defense appears on the face of the complaint").

The Supreme Court has held that the loss complained of must be attributable to misstatements that cause a decline in a security's value once the truth is revealed.  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (rejecting plaintiff's claim of loss causation because of the "complaint's failure to claim that Dura's share price fell significantly after the truth became known").  The critical inquiry is whether the purported misstatements or omissions "concealed something from the market that, *when disclosed*, negatively affected the value of the security."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis added); *see also In re State Street Bank*, 2011 WL 1206070 at *8 (in Section 11 claims, "it is crucial that there be a *revelation of the concealed risk* and that the revelation cause a depreciation in the value of the security (emphasis added)).

19

Here, the fact allegedly concealed from the public—that Mecox planned to emphasize sales through its online platform—was not revealed *at all* in the November 29, 2010 press release.  In fact, it was disclosed in the Prospectus, and thus could not have caused Plaintiff's alleged losses.[23]  *See Iowa Public Employees' Ret. System v. MF Global, Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010) (affirming dismissal of Securities Act claim because purported misrepresentation was not revealed to the public, and thus was "apparent on the face of the complaint, that the stock price decline (and the plaintiffs' resulting losses) [could not] be attributed to the prospectus's failure to disclose that alleged fact"); *In re Shoretel Inc.*, No. 08-00271, 2009 WL 248326, at *5 (N.D. Cal. Feb. 2, 2009) (dismissing Section 11 claims on causation grounds where press release did not disclose any of the purported misrepresentations).

### B.    The Amended Complaint Fails to Allege any Duty to Disclose or Material Misrepresentations Concerning Mecox's 3Q:10 and 4Q:10 Financial Data

#### 1.    Mecox Had No Duty to Disclose 3Q:10 Financial Data, Which Nevertheless Were Consistent with Data Reported in the Prospectus

Plaintiff alleges that, in violation of SEC Regulation S-K, Item 303(a), Defendants knew at the time of the IPO, but failed to disclose, that Mecox had experienced poor results for 3Q:10 as compared to 3Q:09, including: (1) "a decline [by 4%] in gross margin," (2) "a dramatic increase in expenses (including a 19.8% increase in operating expenses and a 40.2% increase in compensation and benefit expenses)," and (3) "a 22.3% fall in net revenues from its directly operated stores segment."  (Am. Compl. ¶¶ 3, 31, 109, 115, 122.)

Item 303(a) of Regulation S-K requires a registrant to provide financial statements for the preceding three years and any time period that ended more than 135 days prior to the effective date.  17 C.F.R. §§ 210.3-12; 229.303.  Mecox complied with the requirement by including the

---

[23]    Plaintiff also makes passing reference to a May 23, 2011 press release, claiming that it revealed certain unknown facts about Mecox.  (Am. Compl. ¶¶ 83-86.)  That press release, however, was fully consistent with the Prospectus.  The press release cannot serve as the basis for Plaintiff's claim in any event; having been issued several months after this action was brought, it could not have caused Plaintiff's loss.  *See* 15 U.S.C. § 77k(e).

results from its financial statements from 2007-2009 and its results from the first two quarters of

2010.  (*See* Prospectus at 71-78.)  Mecox had no duty to disclose the 3Q:10 financial data, as that

quarter was only 26 days old when the IPO became effective—well under Item 303(a)'s 135-day

requirement.  *See* 17 C.F.R. § 210.3-12.

Item 303 of Regulation S-K requires only that an issuer of securities "[d]escribe any

known trends or uncertainties that have had or that [it] reasonably expects will have a material

favorable or unfavorable impact on net sales or revenues or income from continuing operations."

17 C.F.R. § 229.303(a)(3)(ii).  The aim of Item 303 is to explain irregularities in offering

documents and prevent a company's last reported financial results from misleading potential

investors.  *Id.*  But as explained above, nothing in the 3Q:10 financial data was materially out of

line with what already had been disclosed.  The Prospectus disclosed:

- Declines in gross margins, and that gross margins could continue to decline. Moreover, Mecox's overall gross margin declined less than 5% from the first half of 2010, not the kind of "extreme departure" requiring disclosure.  *See In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (9% drop in operating income for one quarter was not a sufficiently extreme departure as to constitute a "trend" requiring disclosure under Item 303);

- That expenses had already been increasing and likely would continue to increase as Mecox expanded its business.  In fact, in raw numbers, operating expenses increased only $3.5 million, from $17.6 million in 3Q:09 to $21.1 million in 3Q:10.  (November 29, 2010 Press Release at 5-6);

- That there were 19 fewer directly operated stores on June 30, 2010 than there were on December 31, 2009.  The fact that net revenues from directly operated stores decreased $1.9 million—from $8.4 million in 3Q:09 to $6.5 million in 3Q:10—is neither material nor inconsistent with this disclosure.  (*Id.*)

    2.    Mecox Could Not Have Known or Disclosed 4Q:10 Financial Data

Plaintiff also alleges the Prospectus failed to disclose that 4Q:10 revenues from the online

platform "would be flat compared to those achieved in the third quarter."  (Am. Compl. ¶ 68.)

That allegation is frivolous.  *First*, Defendants did not possess a crystal ball that would have

allowed them to predict, *only three weeks into the quarter*, what the 4Q:10 results would be.

"[T]his type of retrospective analysis of awareness cannot be the basis for a claim." *Coronel v. Quanta Cap. Holdings Ltd.*, No. 07-1405, 2009 WL 174656, at *14 (S.D.N.Y. Jan. 26, 2009); *see also Panther Partners, Inc. v. Ikanos Communs., Inc.*, 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008), *rev'd on other grounds,* 347 Fed. Appx. 617, 622 (2d Cir. 2009) (plaintiffs cannot "reverse-engineer" Section 11 claims by alleging "that what only became clear due to subsequent events was somehow known to [defendant] far earlier in time"); *Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 791 (S.D.N.Y. 1997) ("courts have been reluctant to impose liability based upon a failure to disclose data for a fiscal quarter in progress") (citing *Zucker v. Quasha*, 891 F. Supp. 1010, 1015 (D.N.J. 1995) (defendant not liable for failure to disclose, when the quarter in progress was 95% complete, that it was experiencing a higher return rate than predicted in the Registration Statement)).  The standard that Plaintiff would have this Court impose—of accurately projecting revenue numbers only three weeks into a quarter—is an unreasonable one, and not the law.

*Second*, as Mecox explained in the Prospectus, quarter-over-quarter comparisons are not helpful indicators of performance, as "operating results can fluctuate from quarter to quarter and are affected by many factors such as purchase volume from our customers and seasonality." (Prospectus at 69; *see also id.* at 20 (disclosing that first and third quarter revenues are typically lower because of Chinese New Year and lower-priced summer wear, respectively).)  And Defendants could not have compared 4Q:10 with 4Q:09 while 4Q:10 was still in progress.

*Third,* Plaintiff's claim that the 4Q:10 online revenue numbers were flat as compared to 3Q:10 is simply not true.  The 4Q:10 revenue of $50.1 million from the online platform represented a 14.12% *increase* over the $43.9 million net revenue in 3Q:10, and even *exceeded* the 4Q:10 projections in the November 29, 2010 press release.  (Nov. 29, 2010 Press Release at

7; Mar. 1, 2011 Press Release at 5.)  *See, e.g.*, *In re Bristol-Myers Squibb Sec. Litig.*, 312 F.

Supp. 2d 549, 555 (S.D.N.Y. 2004) ("The court need not accept as true an allegation that is

contradicted by documents on which the complaint relies.").

### C. Plaintiff's Remaining Vague Allegations Fail to Establish Loss Causation or Any Material Misrepresentation

Plaintiff's other alleged theories—that Mecox failed to disclose the departure of an

employee, Wang Hongzheng, two months prior to the IPO (Am. Compl. ¶¶ 60-65), claimed it

had a marketing plan, when it did not (Am. Compl. ¶¶ 69-71), and stated it possessed an

adequate system of internal controls to monitor the Company's inventory and gross margins,

when it did not (Am. Compl. ¶¶ 72-77)—do not support a claim under Section 11.

#### 1. Claims Based on These Allegations are Barred by Negative Causation

Because the November 29, 2010 press release did not make any disclosures about the

departure of Hongzheng, Mecox's marketing plan, or Mecox's internal controls, the decline in

Mecox's stock price cannot be attributed to these alleged misrepresentations and omissions.

Claims related to these allegations, therefore, should be dismissed based on negative causation.

*See Iowa Public Employees' Ret. System*, 620 F.3d at 145 (affirming dismissal of Securities Act

claim where alleged misrepresentation was not revealed to the public in a corrective disclosure).

#### 2. Plaintiff Fails to Provide any Specificity Demonstrating How These Allegations Demonstrate Material Misrepresentations

Moreover, Plaintiff does not sufficiently allege any *material* misrepresentations regarding

these three issues.  Plaintiff alleges that Hongzheng was "a key member of the management

team," but has not explained why Hongzheng's role at the company, or his departure, was

material to an investor.  Moreover, his departure was disclosed three months before the IPO, as

Plaintiff itself pleads.  (Am. Compl. ¶¶ 50-54; 61.)  Similarly, Plaintiff provides no non-

conclusory allegations supporting its proposed inference that Mecox lacked a marketing plan

(stating only that a journal article contained an opinion prior to the IPO that Mecox had "no plan to advertise for the Company image")[24] or internal controls (alleging that Mecox failed to disclose its 3Q:10 results or predict 4Q:10 financial data and growth strategies in the Prospectus),[25] particularly given the robust disclosures Mecox made regarding its business strategy and its financial statements.  (Am. Compl. ¶¶ 71, 75.)  *See Panther Partners*, 538 F. Supp. 2d. at 670 (dismissing Section 11 claims where "allegations with regard to what [the company] knew, and when they knew it, lack the specificity and detail needed to rise above the 'speculative' level and into the realm of a 'plausible' pleading").  These vague claims of "mismanagement" are not actionable under the Securities Act, and do not satisfy Rule 8, *see In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003) (claims based on failure to disclose "inadequate" internal controls rest on "garden variety" mismanagement and do not state a claim), let alone the heightened pleading standard of Fed. R. Civ. P. 9(b).

## II.   THE COMPLAINT FAILS TO PLEAD CONTROL PERSON LIABILITY UNDER SECTION 15

The Amended Complaint asserts a "control person" claim under Section 15 of the Securities Act against defendants Shen, Ying, Zhang, Gu, Yu, Lo, and Sun.  Where, as here, the complaint does not allege a primary violation of Section 11, there can be no control person

---

[24]    Indeed, Plaintiff's uncertified translation of the article is incorrect.  A certified translation demonstrates that it actually reads:  "Currently, Mecox Lane does not plan to do specific image advertising in these markets," referring to second-tier or third-tier cities and rural markets.  (Baker Decl. Ex. 8 (*Economic Herald* article).)  *Cf. Puerto Ricans for Puerto Rico Party v. Dalmau*, 544 F.3d 58, 70 (1st Cir. 2008) (noting that party failed to make a proper record by declining to provide a certified translation of relevant documents); *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 232 (N.D.N.Y. 2009) (relying upon failure to provide court with a certified translation).

[25]    Plaintiff's vague claim that there were "material inconsistencies between the financials reported in the Prospectus and the financials reported to the Chinese government," which Plaintiff suggests show a lack of internal controls, is false, based on the documents themselves.  Plaintiff alleges that Mecox reported a lower net profit for FY 2008 to the Administration of Industry and Commerce in China ("AIC") than the Company reported in the Prospectus.  (Am. Compl. ¶ 77.)  The profits Mecox reported to the AIC in 2008, however, related *only* to Mecox subsidiaries and affiliated entities in the People's Republic of China, and did so *without* certain adjustments.  By contrast, Mecox reported in its Prospectus profits related to all entities in the enterprise, including from Mecox's substantial Cayman entity, and factored in various consolidation adjustments.  (*See* Declaration of Xu Shen ¶ 4.)

liability.  *Lindsay v. Morgan Stanley* (*In re Morgan Stanley Info. Fund Sec. Litig.*), 592 F.3d 347,

358 (2d Cir. 2010) (section 15 claim is predicated on plaintiff's ability to demonstrate primary

liability); *In re CIT Group, Inc.*, 349 F. Supp. 2d 685, 692 (S.D.N.Y. 2004) (same).[26]

## CONCLUSION

For the reasons set forth above, Defendants respectfully request dismissal of the

Complaint with prejudice.[27]

Dated:  August 1, 2011
New York, New York

LATHAM & WATKINS LLP

By:  /s/ Robert J. Malionek
_____
David M. Brodsky (david.brodsky@lw.com)
Robert J. Malionek (robert.malionek@lw.com)
Howard G. Baker (gregory.baker@lw.com)
John D. Castiglione (john.castiglione@lw.com)

885 Third Avenue, Suite 1000
New York, NY 10022
Telephone: (212) 906-1200

*Attorneys for Defendants Mecox Lane Limited, Neil Nanpeng Shen, John J. Ying, Paul Bang Zhang, Alfred Beichun Gu, Kelvin Kenling Yu, Anthony Kai Yiu Lo, and David Jian Sun*

---

[26]     While Paul Bang Zhang is listed in the Amended Complaint's caption (copied from prior complaints), no claims are asserted against him.  Accordingly, the Amended Complaint must be dismissed as to him.

[27]     Plaintiff should not be permitted to file yet another complaint, as Plaintiff has failed to allege any set of facts that would survive a motion to dismiss.  *See, e.g.*, *Segatt v. GSI Holding Corp.*, No. 07-11413, 2008 WL 4865033, at *3 (S.D.N.Y. Nov. 3, 3008) ("[I]f 'the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied.'") (quoting *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999); *Jones v. N.Y. State Div. of Military & Naval Affairs*, 166 F.3d 45, 50 (2d Cir. 1999) (district court may deny leave to amend when amendment would be futile).