UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X

AHMED ARFA, individually and on behalf
of all others similarly situated,                    10 Civ. 9053

                                                        OPINION

                         Plaintiff,

     -against-

MECOX LANE LIMITED, NEIL NANPENG SHEN,
JOHN J. YING, PAUL BANG ZHANG, ALFRED
BEICHUN GU, KELVIN KENLING YU, ANTHONY
KAI YIU LO, DAVID JIAN SUN, UBS AG, and
CREDIT SUISSE SECURITIES (USA) LLC,


                         Defendants.

---------------------------------------X

A P P E A R A N C E S:



          Attorneys for Plaintiff

          KAHN SWICK & FOTI, LLC
          500 Fifth Avenue, Suite 1810
          New York, NY  10110
          By:  Kim Elaine Miller, Esq.
               Lewis Stephen Kahn, Esq.
               Craig J. Geraci, Esq.
               J. Ryan Lopatka, Esq.


          POMERANTZ HAUDEK GROSSMAN & GROSS LLP
          100 Park Avenue
          New York, NY  10017
          By:  Jeremy Alan Lieberman, Esq.

Attorneys for Defendants Mecox Lane Limited, Neil
Nanpeng Shen, John J. Ying, Paul Bang Zhang, Alfred
Beichun Gu, Kelvin Kenling Yu, Anthony Kai Yiu Lo and
David Jian Sun

LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY  10022
By:  David M. Brodsky, Esq.
     Robert John Malionek, Esq.
     Howard Gregory Baker, Esq.
     John Daniel Castiglione, Esq.


Attorneys for Defendants UBS AG and Credit Suisse
Securities (USA) LLC

O'MELVENY & MYERS, LLC
7 Times Square
New York, NY  10036
By:  Bradley Jay Butwin, Esq.
     Valerya Cohen, Esq.
     William Joseph Sushon, Esq.

**Sweet, D.J.**

The Defendants Mecox Lane Limited ("Mecox"), Neil Nanpeng Shen ("Shen"), John J. Ying ("Ying"), Paul Bang Zhang ("Zhang"), Alfred Beichun Gu ("Gu"), Kelvin Kenling Yu ("Yu"), Anthony Kai Yiu Lo ("Lo") and David Jian Sun ("Sun" and, with Shen, Ying, Zhang, Gu, Yu and Lo, the "Individual Defendants"), joined by Defendants UBS AG and Credit Suisse Securities (USA) LLC (the "Underwriter Defendants" and, collectively with Mecox and the Individual Defendants, the "Defendants") have moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the Consolidated Amended Class Action Complaint filed by Plaintiff Ahmed Arfa ("Arfa" or the "Plaintiff"). Based upon the conclusions set forth below, Defendants' motion is granted.

**Prior Proceedings**

On December 3, 2010, the Plaintiff filed his initial complaint in the Southern District of New York, alleging that Mecox, its Board of Directors, its Chief Financial Officer and the underwriters involved in an October 2010 initial public offering ("IPO") included or allowed the inclusion of materially false and misleading statements in the registration statement

1

and prospectus issued in connection with the IPO, in violation of the Securities Act of 1933.  The Complaint alleged violations of § 11 of the Securities Act against all Defendants and violations of § 15 of the Securities Act against Shen, Ying, Zhang and Gu.

On February 1, 2011, after Plaintiff's counsel published a PSLRA-mandated notice that a class action had been initiated against the Defendants, a member of the proposed class, Westend Group, moved this Court for an order consolidating this case with Brady v. Mecox Lane Limited, et. al, 11 Civ. 0034 (S.D.N.Y.), appointing Westend Group as lead plaintiff and approving Westend's selection of Kahn Swick & Foti, LLC and Pomerantz Haudek Grossman & Gross, LLP as co-lead counsel.  On March 31, 2011, the unopposed motion was granted.

On June 2, 2011, the Plaintiff filed a Consolidated Amended Class Action Complaint (the "Amended Complaint"), alleging four causes of action: (1) violations of § 11 of the Securities Act against Mecox, (2) violations of § 11 of the Securities Act against the Individual Defendants, (3) violations of § 11 of the Securities Act against the Underwriter Defendants

2

and (4) violations of § 15 of the Securities Act against Shen, Ying and Gu as control persons of Mecox.

On August 1, 2011, Mecox and the Individual Defendants filed a motion to dismiss the Amended Complaint, which the Underwriter Defendants joined.  The motion was marked fully submitted on January 18, 2012.

**The Complaint**

The Amended Complaint asserts the following allegations, which are assumed to be true for purposes of addressing the present motion to dismiss.

On October 26, 2010, Mecox sold 11,742,857 American depositary shares ("ADSs"), each representing seven ordinary shares of Mecox, for $11.00 per ADS in an IPO.  Mecox, a Chinese corporation, operates China's leading online platform for apparel and accessories as measured by revenues in 2009.  The company's product offerings include apparel and accessories, home products, beauty and healthcare products and other products under several different brand names.  Mecox' revenues are derived from sales in three different "segments:" an online

3

platform, directly operated physical stores and franchisee-
operated physical stores.  At the time of the October 2010 IPO,
the Individual Defendants, all of whom are alleged to have
signed the registration statement that was filed with the SEC,
held the following roles: Shen was Chairman of the Board of
Directors, Ying was Vice Chairman of the Board of Directors, Gu
was both Chief Executive Officer and a member of the Board of
Directors and Yu, Lo and Sun were all members of the Board of
Directors.  The Underwriter Defendants acted as lead or
representative underwriters during the October 2010 IPO,
facilitating the distribution of shares of Mecox stock to
investors and initiating the first public market for Mecox
shares.

          In connection with the October 2010 IPO, Mecox issued
a registration statement, including a prospectus.  According to
the Amended Complaint, the registration statement contained a
number of materially untrue and misleading statements and
omissions, including:

- Touting increasing growth in net revenues in all
  segments;

- Showing a significant year-over-year increase in the
  number of physical stores and claiming that Mecox

4

planned to open additional franchise and directly operated stores;

- Claiming that Mecox intended to "promote higher margin sales," noting that its highest margin sales came from its directly operated stores and its lowest margin sales came from the online segment;

- Showing tremendous growth in the online platform, and forecasting continuing "rapid" growth" in online platform sales;

- Stating that the expansion of directly operated stores increased compensation and benefit expenses;

- Touting the ability to "effectively and continuously" monitory Mecox' sales and financial metrics; and

- Failing to disclose that Mecox' results for the third quarter of 2010 were out of line with the positive trends reported in the registration statement, thereby casting doubt as to Mecox' ability to maintain high revenues and "high margin" sales

According to the Amended Complaint, it was only after the close of trading on November 29, 2010 that Mecox issued a press release revealing the truth about Mecox, including:

- Mecox had experienced poor results for the third quarter in 2010, including a decline in gross margin, an increase in expenses and a fall in net revenues from its directly operated stores segment;

- Growth in Mecox' online segment was unsustainable and would cease following the third quarter causing online revenues for the fourth quarter to be flat;

5

- Mecox' purported revenues and net income growth were unsustainable as Mecox' reported revenues in the prospectus were contradicted by information provided to the People's Republic of China's Administration for Industry and Commerce, a fact the Plaintiff contends should have been checked by the Underwriter Defendants;

- Mecox was not supporting the growth of its directly operated stores or the success of its franchise stores with the average number of directly operated stores falling in the third quarter and, although the number of franchise stores increased by over 300%, net revenues from those stores increased only 35.9%;

- Contrary to the statements in the registration statement that Mecox would "promote higher margin sales," Mecox closed higher-margin directly operated stores in the third quarter 2010 in favor of expansion of its lower-margin franchise stores and Mecox focused on its online platform, which had the smallest gross margin of all three segments;

- Prior to the IPO, profit was falling in Mecox' physical stores, but rather than focus on increasing revenue or marketing the stores, Mecox did not market the stores, instead using them as "fitting rooms" where customers could try on and see clothing in person but make purchases later online; and

- Despite touting the decline in Mecox' dependence on the low margin online platform for revenue over a number of years, Mecox was closing high-margin directly operated stores, revenues in franchise stores were not keeping pace with the expansion in the number of franchises and, for the third quarter 2010, online platform revenues increased.

The Amended Complaint alleges that revelation of this news caused Mecox' share price to plummet.  On November 30, 2010, share price declined from $13.38 per share to $8.15 per share.

Share price continued to decline on December 1, reaching a low of $6.45 before closing at $6.65.

According to the Plaintiff, Mecox' decision to abandon support for its physical stores continued to impact its financial health.  On May 23, 2011, Mecox reported its first quarter results, revealing year-over-year declines in net revenues, gross profit, net revenues from directly operated stores, the number of directly operated stores and gross margin. The following trading day, Mecox' stock price dropped from $4.96 before the first quarter results were released to $3.59.  On May 25, share price continued to decline, closing at $3.52, and the stock price closed the week at $3.40 on May 27, 2011.

On behalf of purchasers of Mecox common stock pursuant to its October 26, 2010 IPO, the Amended Complaint alleges four causes of action: (1) violations of § 11 of the Securities Act against Mecox, (2) violations of § 11 of the Securities Act against the Individual Defendants, (3) violations of § 11 of the Securities Act against the Underwriter Defendants and (4) violations of § 15 of the Securities Act against Shen, Ying and Gu as control persons of Mecox.

7

**The Applicable Standard**

On a motion to dismiss pursuant to Rule 12(b)(6), all
factual allegations in the complaint are accepted as true, and
all inferences are drawn in favor of the pleader. <u>Mills v.
Polar Molecular Corp.</u>, 12 F.3d 1170, 1174 (2d Cir. 1993). "'The
issue is not whether a plaintiff will ultimately prevail but
whether the claimant is entitled to offer evidence to support
the claims . . .'" <u>Villager Pond, Inc. v. Town of Darien</u>, 56
F.3d 375, 378 (2d Cir. 1995).

To survive a motion to dismiss pursuant to Rule
12(b)(6), "a complaint must contain sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible
on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S.Ct. 1937,
1949, 173 L.Ed.2d 868 (2009) (quoting <u>Bell Atl. Corp. v.
Twombly</u>, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929
(2007)). Plaintiffs must allege sufficient facts to "nudge[]
their claims across the line from conceivable to plausible . . .
." <u>Twombly</u>, 550 U.S. at 570. Though the Court must accept the
factual allegations of a complaint as true, it is "'not bound to
accept as true a legal conclusion couched as a factual

8

allegation.'" Iqbal, 129 S.Ct. at 1950 (quoting Twombly, 550 U.S. at 555).

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of and relied on when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002). "If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

"To allege a claim under Section 11 of the Securities Act, a plaintiff need show that a registration statement: (1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statement therein not misleading." Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 408 (S.D.N.Y. 2007) (internal quotation marks and

citations omitted). "To establish a prima facie Section 11 claim, the plaintiff need only plead a material misstatement or omission in a registration statement." In re WRT Energy Sec. Litig., No. 96 Civ. 3610(JFK), 2005 WL 2088406, at *1 (S.D.N.Y. Aug. 30, 2005) (citing Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)). In addition, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements," while "[o]ther defendants bear the burden of demonstrating due diligence." Herman & MacLean, 459 U.S. at 382. Section 15 provides for "control person" liability, and requires that a plaintiff show (1) a primary violation of the Securities Act and (2) "control" by the defendant. See Rombach v. Chang, 355 F.3d 164, 177-78 (2d Cir. 2004).

**The Defendants' Motion To Dismiss The Amended Complaint Is Granted**

Although the parties dispute the appropriate pleading standard for these Securities Act claims, under the applicable Rule 8 pleading standards, the Amended Complaint fails to state a Section 11 claim upon which relief can be granted.

10

Accordingly, the Plaintiff's Section 11 claims, along with the
derivative Section 15 claim, are dismissed.

## A. Rule 8 Pleading Standards Govern The Plaintiff's Securities Act Claims

While asserting that the Amended Complaint must be
dismissed because it fails to satisfy Rule 8 pleading standards,
the Defendants contend that the Amended Complaint is subject to
Rule 9(b)'s heighted pleading requirements because the "wording
and imputations of the complaint are classically associated with
fraud." Rombach, 355 F.3d at 172. According to the Defendants,
because the Plaintiff alleges not only that the Defendants made
a number of materially untrue and misleading statements and
omissions, but also that the Defendants knew, yet specifically
withheld, various material facts from the prospectus, the
Amended Complaint sounds in fraud and Rule 9(b) pleading
standards should apply.

"As a general matter, a plaintiff bringing Securities
Act claims need not comply with the heightened pleading standard
imposed by Rule 9(b) because '[f]raud is not an element or a
requisite to a claim under Section 11 or Section 12(a)(2)." In

11

re Wachovia Equity Secs. Litig., 753 F. Supp. 2d 326, 374

(S.D.N.Y. 2011). However, when Section 11 claims are "premised

on allegations of fraud," heightened pleading standards under

Rule 9(b) apply. Rombach, 355 F.3d at 171; see also Ladmen

Partners, Inc. v. Globalstar, Inc., No. 07 Civ. 0976(LAP), 2008

WL 4449280, at *11 (S.D.N.Y. Sept. 30, 2008). "[A] complaint

may sound in fraud even where, as here, no fraud claims under

the Exchange Act are asserted." Globalstar, 2008 WL 4449280, at

*11. It is the Court's responsibility to scrutinize the

pleadings to determine whether the Plaintiff's Securities Act

claims "sound in negligence or in fraud" to determine the

correct pleading standards. Rombach, 355 F.3d at 171; see also

In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 632

(S.D.N.Y. 2007) ("Rombach necessarily requires a case-by-case

analysis of particular pleadings to determine whether the

gravamen of the complaint is plainly fraud."). The Second

Circuit "did not intend Rombach as an instruction that all § 11

pleadings should be subjected to the Rule 9(b) standard."

Wachovia, 753 F. Supp. 2d at 375.


        The allegations in the Amended Complaint do not sound

in fraud. A key element to asserting fraud is scienter, defined

as "a mental state embracing intent to deceive, manipulate, or

defraud." <u>In re Global Crossing, Ltd. Sec. Litig.</u>, 322 F. Supp.

2d 319, 329 (S.D.N.Y. 2004).  In this case, although the Amended

Complaint alleges that the Defendants made untrue statements in

the registration statement notwithstanding the availability of

more accurate information, there are no accusations that the

Defendants acted with the intent to deceive, manipulate or

defraud.  For example, the Amended Complaint makes the following

accusations:

> While the Company [Mecox] claimed that "[t]he expansion of
> our directly operated stores also increased our
> compensation and benefit expenses and rental expenses,"
> those expenses climbed dramatically in the third quarter of
> 2010, even as the Company completely halted the expansion
> of its directly operated stores.  Undisclosed to investors,
> third quarter 2010 compensation and benefit expenses had
> increased 40.2% from the same quarter of the previous year.
>
> . . .
>
> While it was not disclosed in the Prospectus that the
> Company had lost the key executive with the experience and
> capability of expanding the Company's physical stores as
> touted in the IPO, a July 29, 2010, article translated from
> the Chinese, entitled "MecoxLane's Executive Wang Hong
> Zheng Resigns Multi-channel Expansion of E-Commerce Gets In
> Trouble" . . . further confirmed the resignation occurred
> shortly before the IPO.
>
> . . .
>
> Despite touting the extensive experience of the Company's
> management team and issuing a boilerplate warning that the
> Company's "future success heavily depends upon the
> continued services of our management and other key
> personnel," Defendants omitted to disclose the abrupt

13

departure in August of 2010 of a key nmember of the
management team, executive Wang Hongzheng . . ., which
occurred a mere two months prior to the IPO.

Am. Compl. ¶¶ 38, 50, 61.  Although the Amended Complaint

alleges untrue statements, there is no allegation that the

Defendants acted with scienter.  "Fraud, of course, implies more

than falsity, and the mere fact that a statement is misleading

(as are all false statements, whether intentionally, negligently

or innocently made) does not make it fraudulent."  Refco, 503 F.

Supp. 2d at 632-33.  Accordingly, Rule 8 pleading standards,

rather than the more stringent standards provided under Rule

9(b), are applicable to the present action.

## B. The Amended Complaint Fails To State A Section 11 Claim Upon Which Relief Can Be Granted

Section 11 of the Securities Act permits "any person

acquiring such security" to sue "[i]n case any part of the

registration statement, when such part became effective,

contained an untrue statement of a material fact or omitted to

state a material fact required to be stated therein or necessary

to make the statements therein not misleading."  15 U.S.C. §

77k.  "To fulfill the materiality requirement there must be a

14

substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). According to the Plaintiff, the Amended Complaint alleges five categories of materially untrue and misleading statements and omissions concerning (1) the growth of physical stores, (2) key Mecox personnel, (3) Mecox' revenue growth, (4) Mecox' marketing and (5) Mecox' internal controls and due diligence. However, even when Rule 8's permissive pleading standard is applied, the Amended Complaint fails to state a Section 11 claim upon which relief can be granted with respect to any of the Defendants.

### 1. Materially Untrue And Misleading Statements And Omissions Regarding Growth Of Physical Stores

According to the Plaintiff, the Mecox registration statement contained materially untrue and misleading statements and omissions regarding Mecox' network of physical stores. The Plaintiff highlights a passage from the registration statement that appeared under the heading "Expansion of Physical Store Network:"

15

> We have expanded and plan to continue to expand our store
> network in second- and third-tier cities by opening
> franchised stores in order to achieve high growth with
> minimum capital investment.  As of June 30, 2010, we had
> 320 franchised stores and 158 directly operated stores.  We
> plan to open an additional approximately 20 franchised
> stores and an additional approximately 5 directly operated
> stores in 2010.

Additionally, the Plaintiff notes that the registration

statement stated that Mecox' strategy was to expand the number

of physical stores and promote "higher margin" sales, and such

higher margin sales, according to the registration statement,

arose "through [Mecox'] franchised and directly operated stores

compared to [its] online platform."  According to the Plaintiff,

rather than expand its physical store network, Mecox closed 19

directly operated stores by the third quarter of 2010.


        Notwithstanding the Plaintiff's contentions, the

registration statement disclosed in a single chart on page 59

that Mecox had closed 19 stores.  The chart reveals that on

December 31, 2009, Mecox had 177 directly operated stores, but

on June 30, 2010, Mecox had 158 directly operated stores,

thereby disclosing a loss of 19 stores over the 18 month period.

The Plaintiff rejects this argument, contending that the chart

16

is misleading and that "[s]ome statements, although literally
accurate, can become, through their context and manner of
presentation, devices which mislead investors." McMahan & Co.
v. Wherehouse Entm't, Inc., 900 F.2d 576, 579 (2d Cir. 1990).
However, the numbers the Defendants compare are listed on a
single chart on a single page under the heading "Stores," and
the table lists the number of "Directly operated stores" and
"Franchised stores" along with a total of "All stores."  A
simple comparison of the 177 directly operated stores in
December 2009 with the 158 directly operated stores in June 2010
states that Mecox had closed 19 directly operated stores.  As
such, the fact that Mecox had closed these 19 directly operated
stores was not the subject of any misstatement or omission, but
rather was disclosed in the registration statement.

     With respect to the Plaintiff's contention that Mecox'
stated strategy was to promote "higher margin" sales and such
higher margin sales arose "through [Mecox'] franchised and
directly operated stores compared to [its] online platform," the
registration statement disclosed Mecox' heavy reliance on its
online platform.  On page 58 of the prospectus, Mecox stated:
"Our online platform accounted for 72.8% and 78.5% of our net
revenues in 2009 and for the six months ended June 30, 2010,

17

respectively, and we expect that most of our revenues will
continue to be derived from our online platform as we plan to
market and sell more products, including third-party branded
apparel and accessories products, via our online platform."

          The language the Plaintiff cites concerning Mecox'
desire to "promote higher margin sales" is on page 3 of the
registration statement, where the company lays out its "growth
strategies."  According to the Plaintiff, the language
describing higher margins at physical stores, which appears on
page 57 of the prospectus, establishes that obtaining higher
margin sales requires increasing the number of physical stores:

> We generally generate higher margins by selling our
> proprietary brands as compared to third-party branded
> products, because we retain full brand premium for our own
> branded products.  The relatively high gross margin of
> sales through our franchised and directly operated stores
> compared to our online platform was partly attributable to
> the fact that we only sell our own branded apparel and
> accessories products in our physical stores.

However, disclosures elsewhere in the registration statement
establish that opening physical stores is not the sine qua non
of promoting higher margin sales.  For example, the registration
statement states that "[w]omen's apparel and accessories are

also sold at relatively high margins as compared to other

products."  Other statements in the registration statement

concerning "high margins," "higher margins" or "margin growth"

include:


We will also continue to identify and focus our resources on
fashion product categories that offer high margins and increase
our market share in such categories such as branded apparel and
accessories.

We believe enhanced brand awareness and effective marketing will
help enhance customer acceptance of our branded products and
generate higher margins for us.

In addition, we will continue to expand our design and product
management team, improve its training and place emphasis on
product innovation to drive margin growth.


These statements are about product lines, not the expansion of

physical stores, and no reasonable investor would have

interpreted this language to mean that Mecox was promoting

higher margins by expanding its directly operated stores.

Furthermore, it must be noted that the "promote higher margin

sales" language the Amended Complaint cites comes from a bullet

point preceded by the words: "Our vision is to operate a leading

online platform of fashion products in China.  We intend to

pursue the following growth strategies . . . ."  Notwithstanding

the Plaintiff's contentions, the registration statement thus

suggests "higher margin sales" to be compatible with Mecox'

19

online platform.  Accordingly, the registration statement's
stated growth strategy of promoting "higher margin sales" does
not represent a misrepresentation or omission with respect to
the growth of Mecox' physical stores.

### 2. Materially Untrue And Misleading Statements And Omissions Regarding Key Personnel

The Amended Complaint alleges that, notwithstanding
the registration statement touting a "strong management team
with extensive relevant experience," the Defendants failed to
inform investors that its vice president and general manager in
charge of physical store operations, Wang Hongzheng ("Wang"),
had left Mecox two months prior to the October 2010 IPO.
According to the Plaintiff, Wang was a former general manager
for Mecox competitor Metersbonwe, who had been praised for the
vast store expansion that made Metersbonwe's IPO possible.  The
Plaintiff contends that Wang, when he started at Mecox,
announced his intention to open 2,000 stores within three years.
The Amended Complaint alleges that, despite Wang's importance to
the retail store growth plan, Mecox did not notify investors in
the registration statement that he had left.

20

The Plaintiff's focus on Wang's departure is a repackaging of the Plaintiff's claim concerning Mecox' physical stores, as Wang's departure is only relevant to the extent that it represents a divergence from Mecox' effort to expand the number of physical stores. However, as described above, the registration statement disclosed the closure of 19 directly operated stores as well as the fact that Mecox relied heavily on its online platform and would continue to do so in the future. The Defendants' failure to disclose Wang's departure does not constitute an actionable omission as details concerning the success of the alleged policy to which Wang was integral, namely Mecox' efforts to open more physical stores, were disclosed in the October 26, 2010 registration statement.

### 3. Materially Untrue And Misleading Statements And Omissions Regarding Mecox' Revenue Growth

The Amended Complaint alleges three categories of statements that, according to the Plaintiff, constitute materially untrue and misleading statements and omissions regarding Mecox' revenue growth, including omissions of financial data from the third and fourth quarters of 2010 and misrepresentations regarding Mecox' dependence on its online

platform and expenses.  According to the Amended Complaint, the
Mecox registration statement advertised increasing year-to-year
growth in net revenues from all three segments of the business:
the online platform, directly operated stores and franchised
stores.  However, the registration statement omitted the fact
that third quarter 2010 net revenues from the directly operated
stores fell 22.3% from the previous year and growth from the
online platform was flat.  The Plaintiff contends that Mecox'
quarterly growth from its online platform remained flat during
the fourth quarter, which was underway at the time of the
October 2010 IPO, while the registration statement projected
"rapid growth."  The Plaintiff alleges that the Defendants
violated their duty under both Item 303(a) of Regulation S-K,
which required Mecox to "[d]escribe any known trends or
uncertainties that have had or that [Mecox] reasonably expects
will have a material favorable or unfavorable impact on net
sales or revenues or income from continuing operations," 17
C.F.R. § 229.303(a)(3)(ii), and 17 C.F.R. § 230.408, which
requires the disclosure of material information necessary to
make statements in an offering document not misleading.  The
trends the Plaintiff identifies include declining rates of
growth in Mecox' online platform, increasing expenses and
falling gross margins.  According to the Plaintiff, by failing

to disclose that its third quarter results were out of line with the positive trends and financial information reported in the registration statement or that its fourth quarter results up to October 26, 2010 revealed a different picture of Mecox financial status, the Defendants failed to uphold their disclosure obligations.

The Plaintiff specifically highlights statements concerning Mecox' online platform and its operating expenses. According to the Plaintiff, the registration statement conveyed to investors a decline in Mecox' dependence on its online platform noting that the percentage of revenue attributable to online sales had steadily decreased from 92.2% in 2007, to 86% in 2008, to 72.8% in 2009. However, the Defendants did not inform investors that for the third quarter of 2010, online platform revenues increased to nearly 80%. Additionally, the Plaintiff contends that the Defendants misrepresented the nature of Mecox' rising expenses. According to the Plaintiff, while the registration statement conveyed that expanding directly operated stores would increase expenses and opening franchise stores would minimize them, expenses climbed dramatically in the third quarter of 2010 even though Mecox halted the expansion of

23

directly operated stores and increased the number of franchise
stores.

Item 303(a) requires a registrant to "[d]escribe any
known trends or uncertainties that have had or that the
registrant reasonably expects will have a material favorable or
unfavorable impact on net sales or revenues or income from
continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  "The
Second Circuit has noted that the aim of Item 303 is to explain
irregularities in offering documents and prevent a company's
last reported financial results from misleading potential
investors."  In re Noah Educational Holdings, Ltd. Sec. Litig.,
No. 08 Civ. 9203(RJS), 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 31,
2010).  "So long as plaintiffs plausibly allege that [a
defendant] omitted material information that it was required to
disclose or made material misstatements in its offering
documents, they meet the relatively minimal burden of stating a
claim pursuant to Section[] 11 . . . Where the principal issue
is materiality, an inherently fact-specific finding, the burden
on plaintiffs to state a claim is even lower."  Litwin v.
Blackstone Grp., L.P., 634 F.3d 706, 718 (2d Cir. 2011).

SEC general regulation 17 C.F.R. § 230.408 states:

24

> In addition to the information expressly required to be
> included in a registration statement, there shall be added
> such further material information, if any, as may be
> necessary to make the required statements, in the light of
> the circumstances under which they are made, not
> misleading.

In applying this regulation, a court must determine whether the
complaint adequately alleges that the undisclosed financial data
was material in light of the financial information already
disclosed to investors.  See DeMaria v. Andersen, 318 F.3d 170,
180 (2d Cir. 2003).  "To do so, we engage in the familiar
inquiry of whether there is 'a substantial likelihood that the
disclosure of the omitted [information] would have been viewed
by the reasonable investor as having significantly altered the
total mix of information made available.'"  Id. (quoting TSC
Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct.
2126, 48 L.Ed.2d 757 (1976)).  "Ordinarily, materiality is a
mixed question of law and fact left to the finder of act to
determine.  Therefore, the standard for dismissing is high[.]"
Garber v. Legg Mason, Inc., 537 F. Supp. 2d 597, 611 (S.D.N.Y.
2008).  However, courts in this district have dismissed
complaints notwithstanding a plaintiff's invocation of 17 C.F.R.
§ 230.408(a) in instances where the plaintiff's interpretation

25

of the regulation has been found to be baseless.  See, e.g., <u>In</u>
<u>re Morgan Stanley Mortg. Pass-Through Certificates Litig.</u>, 810
F. Supp. 2d 650, 673 (S.D.N.Y. 2011).

The Plaintiff's claims with respect to Item 303(a) of
Regulation S-K and 17 C.F.R. § 230.408 are dismissed because the
Plaintiff has failed to present either a trend revealed by the
third quarter data or any other information that was not
consistent with the disclosures in the registration statement.[1]
As noted above, the trends the Plaintiff identifies include
declining rates of growth in Mecox' online platform, increasing
expenses and falling gross margins.  With respect to the first
identified trend, the registration statement disclosed, on pages
58 and 59, that 19 fewer directly operated stores were operated
on June 30, 2010 than on December 31, 2009 and that a decreased

---

[1]    Although the Plaintiff raises the fact that data from the
fourth quarter of 2010 was available at the time of the October
26 IPO, the Plaintiff does not cite any authority for the
proposition that the Defendants were obligated to disclose the
results of a quarter in progress.  Cf. <u>In re Focus Media</u>
<u>Holding Ltd. Litig.</u>, 701 F. Supp. 2d 534, 539-40 (S.D.N.Y. 2010)
("Plaintiffs seek to hold Defendants liable for Focus Media's
failure to disclose financial information about the third
quarter before that quarter had concluded.  However, '[t]he
disclosure structure set out by the SEC . . . recognizes how
unworkable and potentially misleading a system of instantaneous
disclosure out [of] the normal reporting periods would be.'"
(quoting <u>In re Turkcell Iletisim Hizmelter, A.S. Sec. Litig.</u>,
202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001)).

proportion of sales in the first half of 2010 were derived from directly operated stores, with a corresponding increase from online sales.  The numbers presented in the registration statement's tables illustrate how the proportion of sales from directly operated stores decreased from 21.0% on December 31, 2009 to 14.8% on June 30, 2010, and that online sales increased from 72.8% to 78.5% between the same dates.  To the extent that this uptick in the proportion of online revenues indicates a trend, the prospectus disclosed it and additional information concerning what the Plaintiff's describe as a near 80% proportion for the online platform in the third quarter would not alter the total mix of information available.

The registration statement also disclosed increasing expenses.  On page 57 of the prospectus, Mecox stated: "With the expansion of our business, we have experienced increases in operating expenses, including compensation and benefit expenses for our retail and corporate office employees, rental of and depreciation related to directly operated stores, call centers, logistics center and corporate facilities, marketing and advertising expenses."  The registration statement also disclosed that "[f]or the six months ended June 30, 2009 and 2010, our compensation and benefit expenses, excluding share-

27

based compensation, were $10.6 million and $17.6 million,
representing 13.9% and 16.4% of our net revenues for the same
periods, respectively." Mecox also stated that it expected its
"selling, general and administrative expenses will increase in
the near term as we hire additional personnel and incur
additional costs in connection with the expansion of our
business." The registration statement thus disclosed the
increases in Mecox' expenses and did not conceal any trend nor
material information.

        The final trend the Plaintiff identifies is a decrease
in Mecox' gross margins. However, the decline in gross margins
was consistent with the registration statement's disclosures.
The registration statement stated: "Our segment gross margin was
44.1% for the six months ended June 30, 2010, compared to 46.0%
for the six months ended June 30, 2009." Additionally, that
same page of the registration statement described how the gross
margin in each of Mecox' three segments had decreased: "The
gross margin for our online platform segment was 42.6% for the
six months ended June 30, 2010 compared to 43.2% for the six
months ended June 30, 2009. . . . The gross margin for our
directly operated store segment was 55.2% for the six months
ended June 30, 2010 compared to 57.2% for the six months ended

28

June 30, 2009. . . . The gross margin for our franchised store

segment was 37.5% for the six months ended June 30, 2010

compared to 40.6% for the six months ended June 30, 2009." As

such, the prospectus disclosed that gross margins were

declining.


Because the Plaintiff has failed to identify either a

trend revealed by the third quarter data or other material

information that was not consistent with the disclosures in the

registration statement, the Plaintiff's Section 11 claims

concerning materially untrue and misleading statements and

omissions regarding Mecox' revenue growth are dismissed.


### 4. Materially Untrue And Misleading Statements And Omissions Regarding Mecox' Marketing


In alleging materially untrue and misleading

statements and omissions regarding Mecox' marketing, the Amended

Complaint includes the following contentions:


> With respect to marketing, the Prospectus touted, "We
> market our products through online advertising, targeted
> distribution of emails, SMS, catalogs, print media
> advertising and out-bound calls."

29

Additionally, regarding marketing activities, the Company
stated the following in the Prospectus:

- "We rely on effective marketing efforts tailored to
  our targeted customers to maintain and increase our
  revenues."

- "We conduct online advertising via portals such as
  Sina, search engines such as Baidu, and other popular
  websites."

- "We plan to acquire new customers on a cost-effective
  basis by enhancing our online advertising efforts,
  improving our e-commerce website and catalog design,
  and further diversifying our product offerings."

- "Brand image is an important factor which affects a
  customer's purchasing decision with respect to our
  products.  Our success therefore depends on, among
  other things, market recognition and acceptance of our
  private brands and the culture, lifestyle and images
  associated with the brands, some of which may not be
  within our control . . ."

- "We will launch marketing and advertising campaigns to
  associate these brands with trendy fashion events and
  cultural occasions."

In truth, with respect to marketing, as the pre-IPO
Economic Herald article noted "Currently, MecoxLane has no
plan to advertise for the Company image."


In addition to the Economic Herald article mentioned in this

section of the Amended Complaint, the Plaintiff's opposition

also highlights the Amended Complaint's discussion of a

confidential witness, CW 1, a Mecox franchisee.  Regarding CW 1,

the Amended Complaint states, in relevant part:

30

Information provided by CW 1, a franchisee of Mecox
physical stores, further demonstrates a lack of support for
or promotion of physical stores.  CW 1 reported that the
opportunity to purchase franchises in Shanghai was first
made available in December 2009.  CW 1 explained that there
were approximately seven or eight districts in Shanghai,
and s/he was granted franchise rights in one district that
did not yet have any Mecox-owned or franchise stores.  CW
1's franchise agreement required CW 1 to open two stores
within two years, or Mecox could give the right to another
franchisee to open a stores win CW 1's district.  In
compliance with the agreement, CW 1 opened two stores in
spring 2010.  Despite the terms of the agreement, Mecox
granted the right to another franchisee to open a store.
CW 1 reported that s/he has heard of another Shangai [sic]
district where this occurred.

CW 1 said that every three months, franchisees are invited
to attend ordering conferences and they can view the new
clothing styles on models.  However, s/he said the clothing
does not arrive until six months later and the quality of
the clothes received in the stores is not as good as what
the models wear during the order conference.  In addition,
once the clothing is in the store and s/he is better able
to determine what is popular, s/he is told by Mecox that
additional quantities are not available, even though those
styles continue to be available in the Mecox-owned stores.

The Plaintiff's Section 11 claims concerning Mecox'
alleged misrepresentations concerning its marketing strategy
fail because the Amended Complaint does not include sufficient
factual matter to state a claim upon which relief can be based.
See Iqbal, 129 S.Ct. at 1949.  The Plaintiff has alleged two
sets of facts that allegedly demonstrate the registration
statement's materially untrue and misleading statements and
omissions regarding Mecox' marketing: the Economic Herald

31

article and CW 1's allegations.  A certified translation[2] of the

Economic Herald article includes the phrase: "Currently, Mecox

Lane does not plan to do specific image advertising in these

markets."  The passage from the article that includes this

language reads, in relevant part:

> The retail stores mainly sell Mecox Lane's own brands
> "Euromoda" and "Rampage."  If you go to the stores in
> second-tier or third-tier [cities], or even the rural
> market, in terms of visibility, can Mecox Lane's "Euromoda"
> and "Rampage" brands beat Jeanswest and Baleno, which have
> been around for many years?  Mecox Lane believes that it
> has distinguished itself from these brands in product
> positioning, in order to emphasize fashion instead of
> sports and leisure.  Currently, Mecox Lane does not plan to
> do specific image advertising in these markets.  "[We] may
> be opening some flagship stores," according to Sang
> Xiaobin.

This translation of the Economic Herald article reveals that

Mecox did not plan to do "specific image advertising" in second-

tier or third-tier cities or the rural market.  This fact is in

no way contradictory to the allegedly untrue or misleading

statements the Amended Complaint cites from the registration

statement.  Similarly, although CW 1's allegations may

illustrate Mecox' failure to promote physical stores, the

---

[2]    The certificated translation upon which the Court relies
was submitted by the Defendants.  The Plaintiff did not submit
any translation of the Economic Herald article.

witness' factual contentions do not establish the untrue or misleading nature of any of the portions of the registration statement.  Because the Plaintiff has not alleged sufficient facts to nudge his claims across the line from conceivable to plausible, the Section 11 claim predicated on the registration statement's discussion of Mecox' marketing is dismissed.

### 5. Materially Untrue And Misleading Statements And Omissions Regarding Mecox' Internal Controls And Due Diligence

According to the Amended Complaint, the registration statement misled investors into believing that Mecox collected, analyzed and distributed accurate, up-to-date information regarding Mecox' finances by representing to investors that Mecox had a "proprietary management information system" in place to monitor inventory and gross margins and that its online platform allowed them to collect data "effectively and continuously."  The Plaintiff contends that, notwithstanding this management information system, the registration statement failed to include material information regarding Mecox' third quarter or its fourth quarter financial condition or its growth strategies.  Additionally, the Plaintiff states that the Defendants failed to conduct an adequate due diligence

33

investigation, which would have revealed the poor results for
the third quarter 2010, the poor results for the fourth quarter
2010 as well as material inconsistencies between the financial
reported in the registration statement and the financials
reported to the Chinese government.  As an example, the Amended
Complaint states that the registration statement reported total
net income as $4.1 million in 2007, $3.5 million in 2008 and
$7.2 million in 2009, but that Mecox' filings with the Chinese
government reported only $825,544.41 net profit for fiscal year
2008, a figure the Plaintiff contends is materially lower and
evidence of Mecox' volatility.

          Regarding Mecox' internal controls and due diligence,
the Amended Complaint fails to provide a sufficient factual
basis to support a Section 11 claim.  As described above, the
Plaintiff has not presented any inconsistencies between the
disclosures in the registration statement and the third quarter
financial results.  Although the Plaintiff also seeks to impose
liability based on fourth quarter financial data, there is no
indication that the Defendant had any obligation to disclose the
results of a quarter in progress.  See Focus Media Holding, 701
F. Supp. 2d at 539-40.  With respect to the Amended Complaint's
alleged discrepancy in Mecox' 2008 reported financial results,

34

the Amended Complaint does not allege the registration
statement's 2008 figures to be false, only that a different
figure was filed with the Chinese government.  The Defendants
claim, and the Plaintiff does not dispute, that the profits
Mecox reported to the Chinese government in 2008 related only to
Mecox subsidiaries and affiliated entities in the People's
Republic of China, while in the registration statement, Mecox
reported its profits related to all entities.  Even when the
facts in the Amended Complaint are accepted as true, the Amended
Complaint fails to plead how this discrepancy makes the October
2010 registration untrue or misleading.  Because the Amended
Complaint lacks sufficient factual allegations to state a
plausible claim for relief, the Section 11 claim predicated on
untrue and misleading statements and omissions regarding Mecox'
internal controls and due diligence is dismissed.

## C. Because The Amended Complaint Fails To State A Section 11 Claim, The Derivative Section 15 Claim Is Also Dismissed

In addition to the Section 11 claim, the Amended
Complaint asserts a "control person" claim under Section 15 of
the Securities Act against Shen, Ying, Zhang, Gu, Yu, Lo and
Sun.  When a complaint does not allege a primary violation of

35

Section 11, there can be no control person liability.  See In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010); In re CIT Grp., Inc., 349 F. Supp. 2d 685, 691-92 (S.D.N.Y. 2004).  Accordingly, the Plaintiff's Section 15 claim is dismissed.

**Conclusion**

Based on the conclusions set forth above, the Defendants' motion to dismiss the Amended Complaint is granted. Leave to replead within twenty days is granted.

It is so ordered.

**New York, NY**
**March /  , 2012**

ROBERT W. SWEET
U.S.D.J.

36